# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

JETTA ALBERTS,                                  )
                                                )
    Plaintiff,                             )
                                                )
    v.                                     )    C.A. No. N18C-07-212 JRJ
                                                )
ALL ABOUT WOMEN, P.A. a Delaware                )
corporation, REGINA SMITH, D.O.,                )
and CHRISTIANA CARE HEALTH                       )
SERVICES, INC,                                  )
                                                )
    Defendants.                            )

## MEMORANDUM OPINION

Date Submitted: July 21, 2020
Date Decided: November 10, 2020

*Upon Plaintiff's Motion to Strike Errata Corrections*: **GRANTED**

Randall E. Robbins, Esquire, Randall J. Teti, Esquire, Ashby & Geddes, Wilmington, Delaware, Attorneys for Plaintiff.

Gregory S. McKee, Esquire, Lauren C. McConnell, Esquire, Wharton, Levin, Ehrmantraut & Klein, P.A., Wilmington, Delaware, John D. Balaguer, Esquire, Lindsay E. Imbrogno, Esquire, White and Williams LLP, Wilmington, Delaware, Attorneys for Defendants.

**Jurden, P.J.**

# I. INTRODUCTION

This is a medical negligence action arising from a myomectomy performed on Plaintiff Jetta Alberts ("Plaintiff") at Christiana Hospital on September 6, 2017 that ultimately resulted in the loss of her uterus at the age of twenty-five.[1] On June 3, 2020, Plaintiff deposed Diane McCracken, M.D., an owner of Defendant All About Women, P.A., (collectively, with Dr. Regina Smith, D.O., "Defendants") and the supervising attending physician who was responsible for Plaintiff's post-operative care.[2] Following that deposition, and as a result of Dr. McCracken's testimony, the Plaintiff's OB/GYN expert supplemented his expert opinions, opining, among other things, that Dr. McCracken breached the standard of care with respect to the clinical assessment of the Plaintiff.[3] Almost a month later, Dr. McCracken submitted an *errata* sheet setting forth multiple "desired corrections" ("corrections") to her deposition testimony (collectively, the "*Errata* sheet"). Plaintiff moves to strike a number of these corrections, arguing they significantly "manipulate, supplement, or change" Dr. McCracken's deposition answers.[4]

For the following reasons, Plaintiff's Motion to Strike *Errata* Corrections is **GRANTED.**

---

[1] D.I. 107 ¶ 1. A myomectomy is a surgical procedure to remove uterine fibroids. D.I. 1 ¶ 13.
[2] *Id.* ¶ 3.
[3] D.I. 107, Ex. B at 3.
[4] D.I. 107 ¶ 4. Dr. McCracken reserved the right to review and read her deposition transcript. D.I. 120 ¶ 1.

## II. FACTS AND PROCEDURAL HISTORY

### A. Plaintiff's Medical Negligence Claims

Plaintiff alleges Defendants breached the standard of care by failing to timely recognize Plaintiff experienced post-operative internal bleeding in the two days following her myomectomy.[5] By the time Defendants discovered the bleeding, Plaintiff had lost almost two-thirds of her blood volume and had to undergo an emergency hysterectomy.[6] According to Plaintiff, the standard of care required Defendants to be cognizant of her full clinical picture and immediately recognize the signs and symptoms of internal bleeding throughout post-operation day one ("POD1") and the morning of post-operation day two ("POD2").[7] Plaintiff claims that had the Defendants met the standard of care, Plaintiff would not have experienced such significant blood loss and would not have had to undergo the hysterectomy.[8]

---

[5] D.I. 107 ¶ 1

[6] *Id.* ¶ 2.

[7] *Id.*

[8] *Id.* According to Plaintiff, a significant issue in this case is whether Defendants failed to recognize the signs and symptoms of internal bleeding throughout POD1 (9/7/17) and the morning of POD2 (9/8/17). The signs and symptoms included POD1 bloodwork showing a 6-point hemoglobin drop to 7.1 from Plaintiff's pre-op hemoglobin of 13.2, representing a loss of nearly 50% of her blood volume, together with persistent pain, persistent nausea and vomiting, fluid imbalance, and elevated heartrate, all consistent with internal bleeding. Plaintiff contends Defendants never checked the POD1 bloodwork results on POD1 that were posted to Plaintiff's chart at 9:07 a.m. according to CCHS's audit trail. It was not until POD2, when Plaintiff's hemoglobin level dropped to 4.7, that Defendants recognized Plaintiff was bleeding internally and had lost nearly 2/3 of her blood volume. She underwent the hysterectomy shortly thereafter. Plaintiff maintains that the standard of care required Defendants to, among other things, check

## B. Plaintiff's Motion to Strike the McCracken *Errata* Sheet Corrections

On June 3, 2020, Plaintiff took Dr. McCracken's deposition.[9] After receiving a copy of Dr. McCracken's deposition transcript, Plaintiff's OB/GYN expert, Dr. Daniel Small, M.D., supplemented his expert disclosure ("Supplemental Disclosure") to add that, in his expert opinion, (1) Dr. McCracken breached the standard of care owed to Plaintiff when she failed to recognize the "obvious signs, symptoms and labs consistent with internal bleeding" until POD2,[10] (2) Dr. McCracken's testimony that "potentially any of us or potentially none of us" responsible for Plaintiff's care would know the elements of the clinical information necessary to diagnose Plaintiff's condition, falls below the standard of care,[11] and (3) Dr. McCracken's testimony regarding what a "clinical picture" means is a "grossly inaccurate representation of the meaning of clinical picture, and falls far below the knowledge and skill ordinarily employed by an attending

---

the bloodwork results they ordered and to be aware of Plaintiff's total clinical picture. D.I. 107 ¶ 2.

[9] *Id.* ¶ 3. Plaintiff originally sought to take Dr. McCracken's deposition in November 2019, but the parties were unable to agree to a common date until April, when COVID-19 struck. The parties agreed to a date in June in order to safely conduct the deposition. Hr'g: 3:23-6:4.

[10] D.I. 107, Ex. B at 3. In his first expert disclosure, Dr. Small opined that the hospital's doctors, residents, and nurses, including Dr. Regina Smith, breached the standard of care by failing to timely respond to Plaintiff's internal bleeding until her risk level was dangerously high and failing to investigate and be aware of Plaintiff's whole clinical picture. *Id.* at 3, 5.

[11] *Id.* at 6, citing McCracken Dep. at 127-28 (internal quotations omitted).

4

OB/GYN and the use of reasonable care and diligence in the postoperative care of a myomectomy patient[.]"[12]

Two weeks after Plaintiff produced Dr. Small's Supplemental Disclosure, and almost one month after her deposition, Dr. McCracken submitted an *Errata* sheet substantively supplementing and changing her deposition testimony.[13] In response, Plaintiff filed the instant motion.

The corrections on the *Errata* sheet Plaintiff moves to strike are as follows:[14]

| Dep. Tr. | Question Asked | Testimony | Desired Corrections |
|---|---|---|---|
| 38:12-19<br><br>1. | Q: Does [Ashley August, P.A.] communicate to you about all patients or just ones where she perceives there's an issue? | A: She typically would – if we have the list in front of us I would say are there any issues? And she would say yes, you know, this person's blood pressure is elevated and this person wants to go home early or something like that.<br>So we wouldn't necessarily go through details of every single patient if the patients are stable. | A: She typically would – **if** we have the list in front of us I would say are there any issues? And she would say yes, you know, this person's blood pressure is elevated and this person wants to go home early or something like that.<br>So we wouldn't necessarily go through **all the** details of every single patient if the patients are stable. |

---

[12] *Id.*

[13] D.I. 107 ¶ 4. Defense counsel received the transcript of Dr. McCracken's deposition on June 5, 2020. D.I. 120 ¶ 3. Plaintiff produced Dr. Small's Supplemental Disclosure on June 17, 2020. D.I. 99.

[14] Desired corrections are in bold and underlined. For ease of reference, the Court has numbered the corrections. The actual *Errata* sheet with the corrections and reasons for the corrections can be found at D.I. 107, Ex. C.

| | | | |
|---|---|---|---|
| 48:6<br><br>2. | Q: And would it be significant to you whether [the myomectomy] was open or laparoscopic? | A: Not necessarily significant. I mean that's, that's just – it's still an abdominal surgery and carries many of the same risks either way. You know, typically recovery is a little longer for an open [myomectomy], but it has in the first day or two similar recovery so . . . | A: Not necessarily significant. I mean that's, that's just - - it's still an abdominal surgery and carries many of the same risks either way. You know, typically recovery is a little longer for an open [myomectomy], but it has in the first day or two similar recovery so **it would be a similar post operative course.** |
| 79:9–10<br><br>3. | Q: [I]'m asking you about September 7th when you were the supervising physician for Jetta Alberts on post-op day one. In that situation would the drop in hemoglobin from 13.2 to 7.1 be relevant to the clinical picture? | A: It would not have changed anything. If I had a patient that's otherwise clinically stable with normal vitals, eating, making urine and a drop to hemoglobin to 7 and no obvious signs of hemorrhage or bleeding, that wouldn't change anything in the clinical picture at that time. | A: It would not have changed anything. If I had a patient that's otherwise clinically stable with normal vitals, eating, making urine and a drop to hemoglobin to 7 and no obvious signs of hemorrhage or bleeding, that wouldn't change anything ~~in~~ **that we do with** the clinical picture at that time. **We would continue to monitor it.** |
| 87:1<br><br>4. | Q: Do you know whether [Plaintiff] was eating? | A: No, I don't. I was not made aware of the nausea so those weren't questions that I had a chance to ask. | A: No, I don't. I was not made aware **by the nurse** of the nausea so those weren't questions that I had a chance to ask. |

| | | | |
|---|---|---|---|
| 127:7 | Q: Who taking care of [Plaintiff] would know the important pieces of clinical information? | A: Well, again, I guess it depends on what their role was. So the nurse would know the vitals and might know a low blood count or might not. The residents might know that, might not. So probably everybody has parts of that clinical information. I think everybody might find more pieces that are more — like people might deem certain pieces important and others not. So everybody might have their own clinical perspective as to what pieces are important and what aren't. | A: Well, again, I guess it depends on what their role was. So the nurse would know the vitals and might know a low blood count or might not. The residents might know that, might not. So probably everybody has parts of that clinical information. I think everybody might find more pieces that are more — like people might deem certain pieces important and others not. So everybody might have their own clinical perspective as to what pieces are important and what aren't. **It is based on the clinical presentation of each individual patient. Depending on that particular presentation, each provider may need to do further investigation in the chart. For example, if one was advancing their diet, it may not be necessary to look back to see when they started advancing their diet.** |

| | | | |
|---|---|---|---|
| 127:18 | Q: How do all of those important pieces get brought together to form a diagnosis? | A: I mean I think that's the role of the clinician when they see the patient, to see what's going on and what are all of the pieces and how do I think it fits. But to say that every person or who's the person in charge of her that knows every little single piece of information is not, that's not realistic. | A: I mean I think that's the role of the clinician when they see the patient, to see what's going on and what are all of the pieces and how do I think it fits. But to say that every person or who's the person in charge of her that knows every little single piece of information is not, that's not realistic. **Again, the clinical picture of the patient is what drives the course of action of any clinician. For example, it [sic] the patient had normal vital signs, one would not necessarily look back to see if the patient ever had tachycardia because under that scenario it wouldn't necessarily be relevant to the patient's management moving forward.** |
| 128:1 | Q: [W]ho knows the pieces of clinical information necessary to diagnose what is currently occurring with the patient? | A: Potentially any of us or potentially none of us. | A: Potentially any of us or potentially none of us. **know everything. However, we would all assess the clinical picture when we evaluate the patient and if there is anything that occurs during that evaluation which raises a question, we could then go into the patient's chart to further investigate that but each scenario is different.** |

| | | | |
|---|---|---|---|
| 132:18<br><br>8. | Q: When you're talking about clinical picture, what are you talking about? | A: I mean clinical picture to me is how the patient is doing clinically. Are they sitting there awake and alert and breathing or are they lying on the floor without a pulse? Right? | A: I mean clinical picture to me is how the patient is doing clinically. Are they sitting there awake and alert and breathing or are they lying on the floor without a pulse? Right? <u>We assess each individual patient and depending on what the evaluation shows, we investigate further in the chart or order addition [sic] tests to ascertain what the care plan would be moving forward. In order to do that, we would typically look for something in the patient's presentation that is not typical for a normal post-operative course.</u> |

## III. PARTIES' CONTENTIONS

Plaintiff argues that Dr. McCracken is using an *errata* sheet to improperly alter her testimony, and by doing so, has deviated from the purpose of an *errata* sheet–to correct typographical errors–not to rewrite harmful or incomplete testimony.[15] Plaintiff contends that allowing the type of changes Dr. McCracken seeks to make will render depositions no longer reliable.[16] Plaintiff further contends that Superior

---

[15] D.I. 107 ¶¶ 6, 8; *see also* Hr'g 45:3-8. Plaintiff's Counsel asks the Court to consider: "…what was the intent of the *Errata* changes? Was it to rewrite depositions and change the reliability of the deposition and the reliability of the discovery process?"

[16] Hr'g. 33:16-20.

Court Rules 30(d) and (e) are in conflict with respect to the degree to which attorneys may be involved with the substance of a deponent's testimony, and the Court should resolve the conflict in a manner that advances justice and avoids absurd results.[17]

Defendants[18] argue that the *Errata* sheet "comports with the clear language of Rule 30(e)" as it clarifies and corrects various aspects of Dr. McCracken's testimony.[19] Defendants concede that some of Dr. McCracken's changes are substantive, but argue they are not contradictory and merely clarify her testimony.[20] According to Defendants, none of Dr. McCracken's changes to her testimony were made in response to Dr. Small's Supplemental Disclosure.[21] Finally, Defendants argue that even if the *Errata* sheet is improper, Plaintiff will have the opportunity to cross-examine Dr. McCracken on her changes at trial or may seek a deposition solely limited to the *Errata* sheet.[22]

---

[17] Hr'g 34:15-35:1.

[18] Defendant Christiana Care Health Services, Inc. takes no position on Plaintiff's Motion. D.I. 117.

[19] D.I. 120 ¶ 4.

[20] Hr'g 18:10-18; 44:11-21.

[21] Hr'g 18:21-23.

[22] D.I. 120 ¶ 10. According to Plaintiff, redeposing the witness would be an ineffective practice because she is now prepared to respond with the litigation talking points. Hr'g 35:2-10.

## IV. DISCUSSION

The meaning of the term *"errata* sheet" is derived from the word *erratum* which means "an error that needs correction."[23]

While Super. Ct. Civ. R. 30(e) allows a deponent to make changes to their deposition testimony in form or substance, it does not allow them to improperly alter what they testified to under oath. A deposition is not a practice quiz. Nor is it a take home exam.[24] An *errata* sheet exceeds the scope of the type of revisions contemplated by Rule 30(e) when the corrections "are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later the import of her original answers could possibly result in a failing grade."[25]

---

[23] Black's Law Dictionary (11th ed. 2019) (defining *errata* sheet as "[a]n attachment to a deposition transcript containing the deponent's corrections upon reading the transcript and the reasons for those corrections.").

[24] *Donald M. Durkin Contracting, Inc. v. City of Newark*, 2006 WL 2724882, at *5 (D.Del. Sept. 22, 2006) (citing *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 (10th Cir. 2002) ("The Rule [30(e)] cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination." (quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D.La. 1992))). In *Durkin*, a deponent executed an *errata* sheet "clarifying" her deposition testimony. The court in *Durkin* treated the *errata* sheet as an affidavit and analyzed it under the sham affidavit rule. *See id.*, at *3-5. Although the McCracken *Errata* sheet was not offered to overcome a summary judgment motion, *Durkin* is instructive to the extent it discusses F.R.C.P. 30(e) and the scope of the type of revisions contemplated by the Rule. *See Crumplar v. Super. Ct. ex rel. New Castle Cnty.*, 56 A.3d 1000, 1007 (Del. 2012) (deciding interpretations of Federal Rules of Civil Procedure provide "persuasive guidance" for interpretation of Superior Court Rules of Civil Procedure).

[25] *Durkin*, 2006 WL 2724882, at *5.

The Plaintiff in this case posits:

> What is the point of a deposition if defense counsel asks questions of his client on cross-examination because of damaging testimony she gave to Plaintiff's counsel on direct on a key issue (here, clinical picture), gets more damaging sworn testimony from his client on that same key issue, but then gets to rewrite both of his client's answers to und[o] the damage?[26]

This is an excellent question.

It is beyond dispute that depositions play a critical role in the discovery process, trial preparation, and trial. They are one of the trial lawyer's most valuable tools. Among other things, they enable the parties to elicit facts and opinions through sworn testimony, which the parties in turn provide to their respective experts to secure expert opinions. In essence, the deposition allows a party to "pin down a witness" on key points. Not only is this sworn testimony used by the parties' experts, it is used at trial to impeach a witness who strays from or contradicts their deposition testimony. In short, plaintiffs and defendants rely heavily on depositions to develop trial strategy and prepare their cases for trial.[27] Because they are so important, deposition preparation, whether it be for a fact

---

[26] D.I. 107 ¶ 7.

[27] The Delaware Supreme Court stated in *Americas Mining Corp. v. Theriault*, "[t]he Court of Chancery noted that when witnesses 'get deposed, you learn things, and you might ask other people or shape your trial strategy differently.'" 51 A.3d 1213, 1238 (2012); *see also Hoey v. Hawkins*, 332 A.2d 403, 406 (Del. 1975) ("Discovery and pretrial practices usually result in the narrowing and clarifying of issues so as to shorten trials and to bring about a greater degree of clarity and justice in the presentation of facts to juries.").

witness or an expert witness, is serious business. This is true for both sides, regardless of which party is taking or defending the deposition. A party should be able to rely on testimony obtained through a deposition because the deponent has sworn under oath that the testimony they are about to give is the truth.[28]

Generally speaking, there is a typical order to discovery in medical negligence cases: first fact witness depositions, then expert witness depositions.[29] This is so not only to ensure discovery is conducted in an orderly, effective, and efficient manner, but also for the simple reason that experts need to know the facts before they formulate their opinions. What is particularly troubling here is the disruptive nature, scope, and timing of Dr. McCracken's alterations to her deposition answers vis-à-vis the issuance of a supplemental expert opinion critical of the care she rendered to Plaintiff.

Two weeks after the McCracken deposition Plaintiff produced Dr. Small's Supplemental Disclosure in which he opined that Dr. McCracken breached the standard of care of a supervising attending OB/GYN by failing to be aware of her patient's pertinent clinical picture and clear signs of internal bleeding. According to Dr. Small, Dr. McCracken's deposition testimony that potentially any or potentially none of the members of the medical team responsible for Plaintiff's

---

[28] Super Ct. Civ. R. 30(b)(4).
[29] *See* Hr'g 8:18-9:3.

care would know the necessary clinical information to make a diagnosis is below the standard of care.[30] On her *Errata* sheet, Dr. McCracken significantly supplements and alters her responses in an apparent effort to make them less damaging. For example, her response to the straightforward question, "…who knows the pieces of clinical information necessary to diagnose what is currently occurring with the patient?" changes from, "[p]otentially any of us or potentially none of us[.]" to,

> [p]otentially any of us or none of us know everything. However, we would all assess the clinical picture when we evaluate the patient and if there is anything that occurs during that evaluation which raises a question, we could then go into the patient's chart to further investigate that…[.].[31]

By way of further example, after Dr. Small opined in his Supplemental Disclosure that Dr. McCracken's testimony that a patient's "clinical picture" means whether a patient is "awake and alert and breathing, or are they lying on the floor without a pulse" is a grossly inaccurate representation that evidences a lack of knowledge and skill required of an OB/GYN in the post-operative care of a myomectomy patient,[32] Dr. McCracken tries to rewrite her response by adding,

> [w]e assess each individual patient and depending on what the evaluation shows, we investigate further in the chart or order additional tests to ascertain what the care plan would be moving forward. In order to do that,

---

[30] D.I. 107, Ex. B ¶ 10a, quoting McCracken Dep. 127:19-128:5.
[31] Correction No. 7, *supra* p. 8.
[32] D.I. 107, Ex. B ¶ 10(b).

14

we could typically look for something in the patient's presentation that is not typical for a normal post-operative course.[33]

Dr. McCracken's *Errata* sheet was provided two weeks after Dr. Smalls' Supplemental Disclosure was produced. Although an attorney is not permitted to consult or confer with their client about their testimony or anticipated testimony during the client's deposition, once the deposition is over, there is no such prohibition.[34] Allowing a deponent to use their *errata* sheet to work around the prohibition in Rule 30(d)(1) by altering sworn testimony in an attempt to undo

---

[33] Correction No. 8, *supra* p. 9. As Plaintiff points out, Correction No. 8 is Dr. McCracken's third attempt at a response to a straightforward question. *See* Mot. at 4-6 (Dr. McCracken provided an answer "first in response to Plaintiff's counsel, second in response to her own counsel, and third in converting the *Errata* [s]heet into a take home deposition").

[34] Super. Ct. Civ. R. 30(d)(1) prohibits the attorney(s) for a deponent from consulting or conferring with the deponent regarding the substance of the testimony already given or anticipated to be given, from the commencement until the conclusion of a deposition, including any recesses or continuances lasting less than five calendar days. Super. Ct. Civ. R. 30(e) does not prohibit a deponent's attorney from consulting or conferring with a deponent about their *errata* sheet. At oral argument, the Court, in response to Plaintiff's argument that Rule 30(d) and (e) are in conflict (Hr'g 34:15-17), raised this with Defense counsel:

> The Court: So, theoretically, after the deposition a fact witness gets the transcript, reviews it. There's no prohibition against that witness talking to anybody about their deposition and getting assistance preparing the *errata* sheet, or is there? Hr'g 16:21-17:2.
>
> Defense Counsel: There's none to my knowledge. *Id.* 17:3-4.
>
> The Court: So there would be nothing to prohibit a witness who had been deposed from talking to their attorney about their testimony after seven days; right? *Id.* 42:7-10.
>
> Defense Counsel: Correct. The same for experts as well. *Id.* 42:11-12.
>
> The Court: That's a little troubling to me when you talk about *errata* sheets that add substantive testimony. *Id.* 42:13-15.

15

damaging answers they gave at their deposition (or respond to an opposing expert's criticism), not only subverts the purpose of the deposition, but the discovery rules themselves.[35] It also increases the cost of litigation and prolongs discovery.[36] If the *errata* sheet gives the deponent a do-over as Defendants seem to maintain it does, deposition testimony, despite being sworn testimony, will no longer be reliable, making it almost meaningless.[37] Once the deposition is

---

[35] *See* Hr'g 10:14-17. The Court: "I don't understand how the discovery process can survive a ruling that says that it's okay to make substantive changes to an *errata* sheet of this extent[.]"; *see also* Hr'g 43:16-21. The Court: "I'm worried about a fact witness after trial that on an *errata* sheet adds substantive amendments and changes to her fact testimony after the period runs during which she's prohibited from having a discussion with the attorney about her testimony."; *In re Examworks Grp., Inc. S'holder Appraisal Litig.*, 2018 WL 1008439, at *5 (Del. Ch. Feb. 21, 2018) ("[T]he purpose[s] of discovery [are] to advance issue formulation, to assist in fact revelation, and to reduce the element of surprise at trial. These instrumental purposes in turn serve the overarching and well established policy underlying pretrial disclosure, which is that a trial decision should result from a disinterested search for truth from all available evidence rather than tactical maneuvers based on the calculated manipulation of evidence and its production." (internal citations omitted)).

[36] Hr'g 28:19-29:6. The Court: "[t]he Plaintiff thinks that they have the landscape set with what that witness's testimony is, the fact testimony. They count on it. We move through discovery. They have their experts take the time and pay the expense to the expert to review that fact testimony and issue a supplemental disclosure, as they must if there are substantive changes to [an] expert's initial opinion, and then to find out, oh, wait a minute, there's more. Do you see the Court's trouble with the precedent that's set for all cases?"

[37] Hr'g 10:4-13. The Court: "[T]his chronology is troubling to me, and the extensive changes to the substance of the testimony after the deposition, after the witness is able to be cross-examined by All About Women's counsel, after the expert disclosures have been made and supplemented, I mean, I can't imagine what havoc would be wreaked if this becomes the norm in cases because depositions will be meaningless because you can just supplement at will through an *errata* sheet."; *see also* Hr'g 30:3-13.

> The Court: The *errata* sheet's not meant to supplement the deposition, is it? That's not the true nature of an *errata* sheet. You know what *errata* means, right? There's an error. It doesn't mean that the witness wishes that he or she could have said something more...That's not the purpose of it. The purpose is to correct an error in testimony; right?

concluded, the deponent can confer with counsel, review the opposing expert reports, talk to other witnesses, and then supplement, alter, tailor and correct any response that is problematic for their side of the case.[38] This brings us back full circle to Plaintiff's question–does this not frustrate the intent of taking sworn testimony in a deposition?[39] The answer is, yes.

As Plaintiff's counsel correctly notes,

> [t]he arguments advanced by [Defendants] in this case will not secure the just, speedy and inexpensive determination of every proceeding[40], but actually have the opposite effect that depositions will no longer be reliable. The opportunity to resolve cases more quickly and more inexpensively through either settlements or motion practice will definitely be effected.[41]

After careful review of Dr. McCracken's deposition testimony, Dr. Small's Supplemental Disclosure, and Dr. McCracken's *Errata* sheet, it appears that her

---

Defense Counsel: Correct.

[38] *See* Hr'g 10:14-17. The Court: "I don't understand how the discovery process can survive a ruling that says that it's okay to make substantive changes to an *errata* sheet of this extent[.]".
[39] As the Court queried more than once during oral argument, "where does this stop?" Hr'g 8:17.
[40] *See* Hr'g 33:8-15. Super. Ct. Civ. R. 1 states, "These rules shall govern the procedure in the Superior Court of the State of Delaware with the exceptions stated in Rule 81. They shall be construed and administered to secure the just, speedy, and inexpensive determination of every proceeding."
[41] Hr'g 33:16-23; *see also* Hr'g 35:2-14. Plaintiff's Counsel: "[i]t would be an absurd result to say that after a deposition a witness, who their attorney actually took the opportunity to question at the deposition to try to clear up matters, can then rewrite all those matters to literally hit the litigation talking points. These are the litigation talking points of their defense. And just to substitute them in every instance where the answer conflicts with the litigation talking points, as Your Honor noted, where does it end? *Errata*, as Your Honor noted, literally means an error in printing or writing. That's the definition of *errata*."

17

revisions to her deposition answers, (on pp. 5-8 of this opinion) are a tactical attempt to rewrite damaging deposition testimony.[42] Dr. McCracken's testimony occurred during a deposition at which she was questioned by Plaintiff's counsel and by her own attorney.[43] Her deposition transcript does not reflect confusion that the *Errata* sheet attempts to explain.[44] Moreover, the reasons she provides for her corrections do not indicate she was confused or misunderstood the questions.[45] The deposition transcript shows that when Dr. McCracken did not understand the questions, she would indicate so to her counsel and Plaintiff's counsel. Also

---

[42] *See Durkin*, 2006 WL 2724882, at *5 (striking the errata corrections as not "clarifications" but alterations of the deponent's testimony on key issues and provided alternative theories and defenses that the defense was now attempting to advance at trial).

[43] Hr'g 13:4-14. The Court: "So I understand what [Defendants are] saying, but isn't that the point of your ability to cross-examine your own fact expert after the plaintiff finishes with them? In case you did think that during the direct deposition exam there was some confusion on your witness's part? You have the opportunity, do you not, to go through on cross and ask questions so that you in your mind can clear up what misunderstanding there may have been. Isn't that the point of giving you cross-examination ability in a deposition?"; *see also* Hr'g 22:23-23:18. The Court: "It seems most of the substantive corrections, additions, amendments to her deposition testimony focus on a better explanation of what is meant by clinical presentation and what that entails. I'm not clear on why if you thought questions were confusing or you thought that the questions were improper on cross-examination she didn't give these answers when you had the opportunity to question her. I don't understand. *How many bites at the apple does a fact witness get to give their sworn testimony?* I don't understand why we didn't get more elaboration on the clinical picture, because on pages 127 through 128 and again on page 132, significant substantive amendments to her deposition testimony regarding clinical presentation. You had that opportunity in response to the questions that I read on direct and on cross to elaborate to this degree, but she did not and she saved it for her *Errata* sheet. Why?" (emphasis added).

[44] D.I. 107, Ex. C. In fact, nowhere on the *Errata* sheet does she state that the reason for her corrections is because she was confused or did not understand the question. Instead, she states: "more precise answer," "clarifies the answer," "more complete answer," "completes and clarifies my answer better[.]"; *see also* McCracken Dep. 38:12-19, 48:6, 79:9-10, 87:1, 127:7, 127:18, 128:1, 132:18.

[45] D.I. 107, Ex. C.

18

important to note is, at the start of Dr. McCracken's deposition, Plaintiff's counsel said to her, "the most important ground rule is to please not answer a question unless you understand the question. Will you do that?"[46] She responded, "Yes."[47] Plaintiff's counsel also asked Dr. McCracken, "[i]f you do not understand the question, will you tell me that you do not understand the question?"[48] Again, Dr. McCracken answered affirmatively.[49] The sworn testimony she now seeks to alter was unambiguous and given in response to clear questions.[50] Ironically, her *Errata* sheet corrections–which are substantive additions and changes–address the very standard of care issues relating to the "clinical picture" addressed by Dr. Small's Supplemental Disclosure. And many of her new answers sound like expert opinions.[51]

An *errata* sheet is not a license to change answers for damage control, or to add things the deponent wishes she had said. Here, the Plaintiff took a thorough

---

[46] McCracken Dep. 3:23-4:2.

[47] *Id.*, 4:3.

[48] *Id.*, 4:8-9.

[49] *See id.*, 4:10.

[50] *Id.* Dr. McCracken had to have known that she would be questioned about the Plaintiff's condition and the standard of care, and it was reasonable for Plaintiff's counsel to expect that Dr. McCracken would be prepared to offer definitive testimony about the Plaintiff's clinical picture.

[51] *See* Correction Nos. 6-8, *supra* pp. 8-9; *see also* Hr'g 27:9-19. The Court: "it sounds to me like an expert opinion on standard of care. I mean, that's what it sounds like. It doesn't sound like a fact witness saying, well, here's who I think would have the information. But it modifies her answer in a pretty significant way and it's–I'm not even sure it's really responsive. So I find it interesting that she felt she had to amend that answer to add that language."; Hr'g 28:10-12. The Court: "[I]t really expands and it's substantive and it's not one isolated incident."

deposition of Dr. McCracken, justifiably assumed the factual landscape was set as it pertained to Dr. McCracken, and moved on with discovery. Plaintiff had her expert take the time (at Plaintiff's expense) to review the McCracken testimony and prepare a Supplemental Disclosure, only to find out the landscape was altered.[52] The *Errata* changes are improper. "A tactic, the sole purpose of which is to subvert a procedural device prescribed by the Court's rules of civil procedure, simply cannot be countenanced."[53]

Defendants argue that even if the *Errata* changes are "improper," the Plaintiff's remedy is to cross-examine her on those changes at trial or seek a deposition solely limited to the *Errata* sheet. Defendants further argue there is no prejudice to Plaintiff.[54] The Court disagrees.[55] First, this case will be tried before a jury, not a judge. Unlike a trial judge in a bench trial, jurors lack the legal education, training, and experience to know and appreciate the significance of Dr. McCracken's substantive *Errata* sheet changes submitted weeks after her deposition, and after she rewrote her testimony ostensibly pursuant to a Court rule.

---

[52] *See* Hr'g 28:19-29:6.

[53] *In re Asbestos Litig.*, 2006 WL 3492370, at *4 (Del. Super. Ct. Nov. 28, 2006).

[54] In so arguing, the Defendants rely on *Mediacom Del., LLC.*, 2018 WL 1286207, at *1. In that case, the judge, not a jury, was the finder of fact. It makes a difference. *See infra* note 52; *see also* Hr'g 31:6-13. ("The difference here is the disruption in the discovery process by what transpired here, the quantum and substantive nature of the *Errata* sheet, "corrections," and that fact that here there's going to be a jury of lay people, and *Mediacom* is an extremely experienced former Superior Court judge and Vice Chancellor who's the finder of facts.")

[55] *See* Hr'g 13:4-14.

According to Plaintiff, "it would be a very confusing process for a jury" and "[a]ll of [it] will get lost in an effective cross-examination."[56] The Court shares this concern.[57]

Second, deposing Dr. McCracken on the *Errata* sheet does not eliminate the prejudice to Plaintiff,[58] and, in this case, it would give carte blanche to deponents to rewrite their deposition testimony via an *errata* sheet.

Dr. McCracken's *Errata* changes are improper and beyond the scope of what is allowable under Rule 30(e) and must be stricken. Rule 30(e) cannot be interpreted to allow a deponent to rewrite their testimony in the manner and to the extent Dr. McCracken did here. To rule otherwise would be to turn depositions into practice quizzes and the *errata* sheets into group projects.

---

[56] Hr'g 38:5, 9-10.

[57] *See* Hr'g 46:7-16. The Court: "…I'm also worried about how this plays in front of a jury, because then you get into a side show of trying to impeach the witness with the *Errata* sheet, and you get into the deposition testimony and it becomes cumbersome in my experience when this sort of thing happens, and it requires the Court to make sure the jury understands how depositions work, how *errata* sheets work and it adds time. It adds time and it takes juror attention."

[58] *See* Hr'g 37:23-38:15; *see also* Hr'g 31:6-16; 33:16-23.

## V.  CONCLUSION

For all the reasons explained above, Plaintiff's Motion to Strike *Errata*

Corrections is **GRANTED**.


**IT IS SO ORDERED**.

Jan R. Jurden, President Judge